NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TRUE NORTH COMPANIES LLC, *Plaintiff/Appellant*,

*v.*

JIA-YEE LAI, *Defendant/Appellee*.

No. 1 CA-CV 18-0528
FILED 10-15-2019

Appeal from the Superior Court in Maricopa County
No. CV 2017-014668
The Honorable Kerstin G. LeMaire, Judge

**AFFIRMED**

COUNSEL

The Payne Law Office, Phoenix
By Chrisopher D. Payne
*Counsel for Plaintiff/Appellant*

Zazueta Law PLLC, Phoenix
By Fabian Zazueta
*Counsel for Defendant/Appellee*

American Civil Liberties Foundation of Arizona, Phoenix
By Kathleen E. Brody, Gregg P. Leslie
*Counsel for Amicus Curiae, American Civil Liberties Union Foundation of Arizona, et al.*

---

## MEMORANDUM DECISION

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Judge Michael J. Brown joined.

---

**C A M P B E L L**, Judge:

¶1         True North Companies appeals from the judgment of the superior court following the dismissal of its defamation action against Jia-Yee Lai. For the following reasons, we affirm.

## BACKGROUND

¶2         In June 2006, Lai began operating a Chinese supermarket ("the supermarket") located within the Chinese Cultural Center ("Center"). Initially, he entered a long-term lease agreement with the Center's owner, but at the expiration of that lease in May 2011, Lai extended the lease on a month-to-month basis.

¶3         In June 2017, 668 North, LLC, a company controlled by the equity-investment firm True North Companies, acquired the Center with the intent to convert the retail space to True North's corporate headquarters. On June 30, 2017, 668 North mailed Lai a notice that his lease would terminate on July 31, 2017, requiring his timely "departure from the premises." To encourage a "smooth and cooperative exit," 668 North stated that it would consider the "possibility" of extending Lai "a small amount of additional time" to relocate if he worked "cooperatively."

¶4         On the heels of 668 North's Center acquisition, several media outlets reported that True North had purchased the Center with the intent to redevelop the property. In response to this publicity and ensuing public criticism and protest, True North contracted with a public relations firm and issued a press release on September 6, 2017, asserting that the Center had "struggled" financially for years, having been "abandoned by the Chinese community." Indeed, the press release stated that the Centers' two "anchor tenants," the supermarket and a restaurant, had filed for bankruptcy, resulting in years of financial losses suffered by the previous landlord. The press release also outlined several proposed "preservation concepts" and concluded with a statement from True North's CEO (and 668 North's manager), David Tedesco, "We hope these various options

demonstrate the genuine good faith and creativity we are extending to the community to reach a mutually-beneficial solution."

¶5          Dissatisfied with Tedesco's proposals, a citizen submitted a petition to the Phoenix City Council ("the Council") requesting the enactment of a "resolution, ordinance or measure" to ensure "the long-term preservation of the Chinese Cultural Center." In response, the Council set the petition as an agenda item for its September policy session. At that meeting, Council staff members recommended that the Council deny the petition, explaining that: (1) the City would be required to compensate the property owner if it sustained any loss from redevelopment restrictions; and (2) no study had been conducted to support a finding that the Center is historically significant.

¶6          At that point, a Council member moved to accept a private donation to fund a historic value survey of the Center. After another Council member seconded the motion, the mayor invited members of the public, including Lai, to speak.

¶7          At the outset of his remarks, Lai identified himself as the Center's "anchor" supermarket owner and stated that he would like "to express [his] opinion" regarding the Center's status. First, Lai noted that Phoenix has numerous office buildings and stated that it would be "a shame" to let the city's only Chinese cultural center "disappear" simply to create more office space. Second, Lai expressed distress that he was forced to dismiss 15 employees due to the supermarket's relocation from the Center, stating he was trying to "bring back" those jobs. Third, Lai stated that he wanted to tell the Council about the Center's new landlord, True North. Detailing the supermarket's substantial inventory and equipment, Lai stated that he was "shocked" when he received True North's notice of termination, providing him only 31 days to vacate the premises. He also asserted that True North had lied "from the beginning to the end." To support this assertion, Lai stated that True North: (1) refused to admit that it had "kick[ed] out" the Center's tenants, instead telling the media that the tenants had moved out because their businesses were failing; (2) removed the supermarket's relocation announcement and posted its own, more favorable notice; and (3) changed the supermarket's locks on his last day to vacate the premises, denying Lai the ability to remove some of his larger items, including "a brand new forklift," which True North claimed he had "abandoned" when he left it "unattended."

¶8          At that point in the meeting, the mayor informed Lai that he had exceeded his allotted time and invited him to address "the motion on

the table" and "issue at hand," namely, whether the Council should accept a private donation to conduct a study of the historical value of the Center. In response, Lai concluded his remarks by stating that any True North proposal would be "worthless" because its representatives had a "habit of lying."

¶9 Three months later, True North filed a defamation complaint against Lai based on his statements at the Council meeting. Specifically, True North alleged that Lai had defamed it by: (1) identifying True North, rather than 668 North, as the supermarket's landlord; (2) stating that True North gave him only 31 days to vacate the premises; (3) claiming that True North "kicked out" the supermarket; (4) asserting that True North told the media that the supermarket had to move because its business was unprofitable; (5) implying that True North stole the supermarket's forklift; and (6) stating that True North "lied all the way," "from the beginning to the end."

¶10 In response, Lai moved to dismiss the complaint pursuant to A.R.S. § 12-752, arguing True North filed the complaint to deter or prevent him from exercising his constitutional rights and requesting an award of attorney fees and costs. To "bolster[] the factual allegations" supporting the complaint, True North moved for leave to amend and filed a proposed amended complaint. The superior court denied True North's motion without prejudice, noting the court still had the motion to dismiss on the original complaint under advisement and "ask[ing] that counsel wait until [that] ruling [wa]s issued."

¶11 After the parties fully briefed the motion to dismiss, the superior court dismissed the complaint with prejudice pursuant to A.R.S. § 12-752, finding that True North had filed the complaint "to deter or infringe upon [Lai's] exercise of his constitutional rights." Lai then applied for attorney fees and costs and the court entered a final judgment dismissing the complaint with prejudice and awarding Lai $11,394.90 in attorney fees and $1,072.50 in costs. True North timely appealed.

**DISCUSSION**

¶12 True North contends that the superior court: (1) improperly denied its motion for leave to amend the complaint, and (2) erroneously dismissed the complaint under A.R.S. § 12–752. We address each claim in turn.

## I. Denial of Motion for Leave to Amend Complaint

**¶13**　　　　First, True North contends that the superior court improperly denied its request to file an amended complaint. As a general rule, amendments should be liberally permitted absent a finding of undue delay, dilatory motive, undue prejudice or futility in the amendment. *Owen v. Super. Ct.*, 133 Ariz. 75, 79 (1982); *Bishop v. State Dep't of Corr.*, 172 Ariz. 472, 474–75 (App. 1992); *see also Wigglesworth v. Mauldin*, 195 Ariz. 432, 439, ¶ 26 (App. 1999) (explaining the superior court should grant a non-moving party the opportunity to amend a complaint "if such an amendment cures its defects"); Ariz. R. Civ. P. 15(a)(2) ("Leave to amend must be freely given when justice requires."). Although the superior court has discretion to deny a motion to amend, we review de novo whether a particular request to amend is futile. *See Bishop*, 172 Ariz. at 474; *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010). An amendment is futile if the proposed amended pleading would be subject to dismissal. *See Carvalho*, 629 F.3d at 893 (explaining a court does not abuse its discretion by denying a request for leave to amend if "the complaint would not be saved by any amendment"). Accordingly, in considering futility, we presume as true all well-pled factual allegations set forth in the proposed amendments. *See Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 7 (2008).

**¶14**　　　　In this case, True North brought only one claim against Lai—defamation—predicated on six statements he made to the Council. To survive Lai's special motion to dismiss, True North needed to allege specific facts that, if true, proved either that Lai's statements did not fall within the ambit of constitutionally-protected speech or that he did not make the statements under the circumstances delineated in A.R.S. § 12–751(1). *See Coleman v. City of Mesa*, 230 Ariz. 352, 355-56, ¶¶ 7-9 (2012).

**¶15**　　　　In denying True North's motion for leave to amend, the superior court did not expressly state whether True North's proposed amendments were futile. Nonetheless, without deciding whether the general rule of liberally permitting amendments applies to special motions to dismiss under A.R.S. § 12-752, we conclude that the superior court did not abuse its discretion by denying True North's motion because, as discussed below, *infra* ¶¶ 26-31, the proposed amendments failed to cure the original complaint's defects, and Lai's challenged statements were not actionable as a matter of law and therefore subject to dismissal. *See Glaze v. Marcus*, 151 Ariz. 538, 540 (App. 1986) ("We will affirm the trial court's decision if it is correct for any reason, even if that reason was not considered by the trial court.").

## II.     Dismissal of Complaint

**¶16**          Next, True North asserts that the superior court erroneously granted Lai's special motion to dismiss. We review de novo the dismissal of a complaint. *Coleman*, 230 Ariz. at 355–56, ¶¶ 7–8.

**¶17**          In 2006, the legislature enacted Arizona's anti-SLAPP (strategic lawsuits against public participation) statute, A.R.S. § 12-752, which provides a special, expedited mechanism for dismissing lawsuits predicated on public participation in governmental proceedings. The statute states, in relevant part:

A.  In any legal action that involves a party's exercise of the right of petition, the defending party may file a motion to dismiss the action under this section.  When possible, the court shall give calendar preference to an action that is brought under this subsection and shall conduct an expedited hearing after the motion is filed with the court and notice of the motion has been served as provided by court rule.

B.  The court shall grant the motion unless the party against whom the motion is made shows that the moving party's exercise of the right of petition did not contain any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual compensable injury to the responding party.  In making this determination, the court shall consider the pleadings and supporting and opposing affidavits stating facts on which the liability or defense is based.  At the request of the moving party, the court shall make findings whether the lawsuit was brought to deter or prevent the moving party from exercising constitutional rights and is thereby brought for an improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation.  If the court finds that the lawsuit was brought to deter or prevent the exercise of constitutional rights or otherwise brought for an improper purpose, the moving party is encouraged to pursue additional sanctions as provided by court rule.

**¶18**          By its self-limiting terms, A.R.S. § 12–752(A) applies only to legal actions that involve "a party's exercise of the right of petition." As statutorily defined and relevant here, the "exercise of the right of petition" is any statement that both "falls within the constitutional protection of free

speech" and is made: (a) before a governmental proceeding; (b) in connection with an issue that is under consideration or review; and (c) "for the purpose of influencing a governmental action, decision or result." A.R.S. § 12–751(1).

**¶19**        As a preliminary matter, True North contends that the superior court erred by granting the special motion to dismiss without first determining whether Lai's statements to the Council qualified as an "exercise of the right of petition." Stated differently, Truth North argues the court was required to find that Lai's statements constituted constitutionally-protected speech before applying the expedited dismissal procedures. According to True North, Lai's statements were not constitutionally protected because: (1) they did not relate to a matter of public concern; (2) a reasonable person could find that they implied "actual facts"; and (3) they are provably false. We review de novo whether statements are constitutionally protected. *See Turner v. Devlin*, 174 Ariz. 201, 203–05 (1993).

**¶20**        Although the First Amendment enshrines the right to free speech, protecting the "uninhibited discussion of public issues," defamatory speech is devoid of constitutional protection. *Milkovich v. Lorain Journal* Co., 497 U.S. 1, 22 (1990). To be defamatory, a statement "must be false" and must bring the subject of the statement "into disrepute, contempt, or ridicule," or impeach the subject's "honesty, virtue, or reputation." *Turner*, 174 Ariz. at 203–04 (quoting *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341 (1989)).

**¶21**        When a challenged statement involves a private figure on a matter of public concern, the plaintiff must show that the statement is "provable as false before a defamation action can lie." *Turner*, 174 Ariz. at 205; *Milkovich*, 497 U.S. at 20 ("[When] a statement involves a private figure on a matter of public concern," a plaintiff must prove falsity). To determine whether statements address a matter of public concern, the court considers the statements' "content, form, and context . . . as revealed by the whole record." *Turner*, 174 Ariz. at 205 (internal quotation marks omitted).

**¶22**        While all disparaging statements can cause reputational harm, a true statement is not defamatory. *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 355 (1991). To be deemed "true" for defamation purposes, every detail of a statement need not be literally accurate; rather, the statement, as a whole, must be "substantially true." *Id*. Under this standard, "[s]light inaccuracies" do not "prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the [statement] is justified." *Id*.

(quoting *Heuisler v. Phoenix Newspapers, Inc.*, 168 Ariz. 278, 285 n.4 (App. 1991)). "When the underlying facts are not disputed, 'the determination of substantial truth is a matter for the court,' which determines whether publishing the literal truth would have made a 'material difference to [the audience].'" *Sign Here Petitions LLC v. Chavez*, 243 Ariz. 99, 108, ¶ 30 (App. 2017) (quoting *Read*, 169 Ariz. at 355). Furthermore, as a matter of law, a statement is not actionable if it is comprised of "loose, figurative, or hyperbolic language" that cannot reasonably be interpreted as stating or implying facts "susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21. If statements are incapable of defamatory meaning, the claim is subject to dismissal. *See Yetman v. English*, 168 Ariz. 71, 79 (1991).

**¶23**　　　　Without expressly outlining this analytic framework, the superior court engaged in an analysis of Lai's statements and concluded that none were defamatory. The record supports the court's conclusions, and none of True North's proposed amendments controvert those findings.

**¶24**　　　　Although True North adamantly argues that the subject of Lai's remarks was a "private" lease dispute, this assertion is belied by True North's press release, which seemingly implied that no public criticism should be directed toward True North because the businesses housed within the Center, specifically the supermarket, were struggling financially and causing losses for the previous landlord. Indeed, examining the entire record, it is apparent that True North, not Lai, injected the "private" lease dispute into the public sphere. Equally important, after True North's redevelopment plans were publicized, the Council received a citizen petition requesting that the Council act to preserve the Center. The Council responded by placing the petition as an item on its policy-session agenda and inviting public debate. Therefore, True North's claim that Lai's statements did not relate to a public concern is without merit.

**¶25**　　　　Having found that the challenged statements related to a matter of public concern, we next consider whether they are provably false. As the plaintiff, True North bore the burden of alleging facts that, if true, proved the statements' falsity. *See Turner*, 174 Ariz. at 205.

**¶26**　　　　First, Lai's statement that True North was his landlord was not defamatory. In its proposed amended complaint, True North denied sole ownership of 668 North, but the record reflects that both True North's CEO and its public relations firm used the companies' names interchangeably. While the companies are different legal entities and there is no dispute that 668 North took assignment of the Center's leases from its previous owner, given the statements made by True North's own

representatives identifying True North as both the Center's purchaser and controller, Lai's statement in no way impugned the company. Therefore, even if not precisely accurate, Lai's statement is not actionable as a matter of law.

¶27  Second, Lai's statement that he was "shocked" when he received True North's notice that it was terminating his lease and granting him only 31 days to vacate the property was not defamatory. As reflected in the record, the termination notice clearly provided Lai with only 31 days to "depart[] from the premises." While the letter also stated that 668 North would consider the "possibility" of extending "a small amount of additional time" to vacate if Lai was "cooperative," Lai's recounting of the letter, particularly within the context of describing his emotional reaction to its contents, was substantially true, notwithstanding that 668 North ultimately granted Lai's request to extend the termination date to 60 days from the initial notice of termination.

¶28  Third, Lai's statement that Truth North "kicked [him] out" was not defamatory.  Reading the statement in context, it is clear Lai was not suggesting that Truth North used physical force to eject him from the property. Rather, he was conveying that his lease was unilaterally terminated by True North. As found by the superior court, the phrase "kick[ed] out" is one commonly used by tenants who have had their lease terminated even though they have complied with its terms, and True North alleged no controverting facts in either its original complaint or proposed amendments.

¶29  Fourth, Lai's statement that True North told the media that the supermarket had to leave because the business was failing was not defamatory. True North stated in its press release that the supermarket's owner had declared bankruptcy and caused the previous landlord to operate at a loss for some time. In his declaration, Lai denied that his business was struggling and presented documentation that the supermarket was current on its lease as of June 5, 2017. Thus, Lai's statement was substantially true, and True North failed to allege any controverting facts in either its original complaint or proposed amendments.

¶30  Fifth, Lai's statements regarding the forklift did not imply that True North had "stolen" the property and were not defamatory. Viewed in context, Lai stated that True North changed the supermarket locks at midnight on his last day to vacate the Center and, given the short amount of time he had to find a new venue and relocate, he was unable to

move 13 "larger items," including a forklift, by that time. Lai further stated that when he returned to the Center to recover the forklift, he was told by True North's representatives that he had "abandoned" the forklift when he "left [it] unattended." As reflected in both its original complaint and its proposed amendments, True North does not controvert or deny the truth of these statements. Instead, True North claims Lai's statements were misleading or false because he "retrieved possession of [the] forklift that [he] left at the premises on August 31, 2017" before the September 12, 2017 Council meeting. Even if True North relinquished control of the forklift to Lai before the Council meeting, however, Lai's statements were not false. Lai did not claim that True North had stolen the forklift, only that it had prevented him from retrieving it, both through the change in locks and the statements of its representatives, neither of which True North denies.

¶31    Finally, Lai's statements accusing True North of lying were, at least in part, tethered to True North's false press release statements claiming that Lai had declared bankruptcy and that the supermarket had caused the previous landlord losses for years, as well as its assertion that Lai had abandoned his property by failing to fully relocate it within the period to vacate. Although Truth North's misrepresentations, alone, do not substantiate Lai's broader statement that True North lied "from the beginning to the end," as found by the superior court, Lai's exaggerated claim constituted "puffery or hyperbole" rather than a statement of fact. That is, the average person would not interpret this statement as an assertion that True North had, in fact, lied in every instance since its inception. *See Yetman*, 168 Ariz. at 76 ("In determining whether speech is actionable, *courts must [] consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person*."). Instead, this statement was an unmistakable exaggeration used to criticize True North's business practices and provide a warning to the Council not to accept True North's representations at face value. *See Turner*, 174 Ariz. at 207–08. Therefore, the statements were not actionable as a matter of law.

¶32    Having found that the content of Lai's statements was constitutionally protected, the remaining question is whether Lai made the statements under the prescribed circumstances set forth in A.R.S. § 12-751(1) to qualify as an "exercise of the right of petition." True North argues that Lai's statements were not made: (1) in response to an issue under consideration by the Council; or (2) to influence the Council's decision.

¶33            The parties do not dispute that Lai made the challenged statements during a governmental proceeding. While it is true that the specific motion preceding the public's remarks was narrow in scope, whether the Council should accept a private donation to fund a historical survey of the Center, the agenda item before the Council was much broader, whether the Council should "enact a resolution, ordinance or measure that ensure[d] the long-term preservation" of the Center. Indeed, immediately following the public's remarks, the Council members spoke and then voted to deny the citizen's petition but grant the Council member's motion to accept the private donation. Therefore, consistent with the superior court's finding, Lai's statements were reasonably related to the issues before the Council, whether a historical survey was necessary and whether the Council needed to enact any measure to ensure the Center's preservation. To the extent True North asserts that Lai's statements were made only "to disparage True North as 'not trustworthy' and 'not acting in genuine good faith'" rather than to influence the Council's decision, we note that these intentions are not mutually exclusive. In other words, there is no dispute that Lai intended to convey to the Council that True North was not trustworthy, but it was for the purpose of encouraging the Council to intercede on the Center's behalf rather than rely on True North's representations that it would act in genuine good faith to preserve historical aspects of the Center.

¶34            Given the uncontroverted evidence, the superior court correctly found that Lai exercised the right of petition when he addressed the Council.  Because Lai's statements were not defamatory and made within the scope of a governmental proceeding to address the citizen petition at issue for the purpose of influencing the Council's vote, the superior court properly granted Lai's special motion to dismiss pursuant to A.R.S. § 12–752. Stated succinctly, the speech at issue cannot be the subject of a defamation action.[1]

---

[1]       In its statement of the issues, True North challenges the superior court's finding that the defamation action was brought to deter Lai from exercising his constitutional right of free speech. By failing to present any argument on this claim, however, True North waived the issue and we do not address it. *See* ARCAP 13(a)(7)(A) (stating an opening brief must contain each of the appellant's "contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies").

**CONCLUSION**

**¶35** For the foregoing reasons, we affirm. Citing A.R.S. § 12–752 and ARCAP 21(a), Lai asks for his attorney fees and costs incurred on appeal. Pursuant to A.R.S. § 12–752(D), the court "shall award the moving party costs and reasonable attorney fees" if the court grants the motion to dismiss. Having affirmed the superior court's special dismissal of the defamation action, we award Lai his reasonable attorney fees and costs incurred on appeal, both conditioned upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED: AA

12